UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LINDA MUNGER,

       Plaintiff,                         Civil Action No. 04-72539

v.                                  HON.  NANCY G. EDMUNDS
                                     U.S. District Judge
                                     HON. R.  STEVEN WHALEN
COMMISSIONER OF SOCIAL         U.S. Magistrate Judge
SECURITY,

       Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff  Linda Munger brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying her application for  Disability Insurance Benefits (DIB) under Title II of the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment be GRANTED, and that Plaintiff's Motion for Summary Judgment be DENIED.

## PROCEDURAL HISTORY

On February 9, 2002,  Plaintiff filed an application for Disability Insurance Benefits (DIB),  alleging an onset of disability date of June 11, 2001 (Tr.  51-53).  After the initial denial of her claim, Plaintiff filed a timely request for an administrative hearing, conducted

-1-

on July 8, 2003 in Flint, Michigan before Administrative Law Judge (ALJ) Douglas N. Jones. Plaintiff, represented by attorney Mikel Lupisella, testified (Tr. 210-242), as did Vocational Expert (VE) Pauline McEachin (Tr. 242-247).  ALJ Jones found Plaintiff not disabled at "Step Four" of his analysis  (Tr.  27)  On June 5, 2004 the Appeals Council denied review (Tr. 5-7). Plaintiff filed for judicial review of the final decision on July 9, 2004.

## BACKGROUND FACTS

Plaintiff,  born October 15, 1951, was age fifty-two when the ALJ issued his decision (Tr. 51).  She received a high school diploma in 1973 (Tr. 21).  Plaintiff's former work includes jobs as a stock chaser, line auditor, and assembly line worker (Tr. 106). Plaintiff alleges disability as of June 11, 2001 due to carpal tunnel syndrome (CTS) in both hands, tendonitis of the right wrist, forearm to elbow, and lower back, as well as upper shoulder and knee pain (Tr. 20, 51).

### A.    Plaintiff's Testimony

On February 20, 2004 Plaintiff testified before ALJ Jones that she lived in a single family home with her husband in Burton, Michigan (Tr. 210).  Plaintiff, right handed, reported that she stood 5' 4" and weighed 274 pounds (Tr. 211).  She stated that before she ceased working on June 11, 2001, she worked at Delphi in Flint, Michigan (Tr. 212).  She indicated that she stopped working in anticipation of her second carpal tunnel surgery, reporting that her pain was so severe, she could not even lift a "can of pop" (Tr. 212). Plaintiff testified that she received approximately $2,400 in permanent disability payments each month and had applied for workman's compensation benefits (Tr. 213).

-2-

Plaintiff stated that she drove almost daily (Tr. 213). She indicated that she had traveled to Florida twice in the previous four months, and in the same period had also gone on a cruise with her husband to celebrate their thirtieth anniversary (Tr. 213-214). She stated that she had undergone two carpal tunnel surgeries on her right hand and one on her left hand, adding that prior to her carpal tunnel surgeries, she had received treatment for a severed tendon in her middle finger (Tr. 214-216). She reported that she also had spurs removed from her right heel (Tr. 217). She stated that she currently treated with her family physician, as well as a neurologist for her wrist condition and another physician providing care for complications of a breast reduction surgery (Tr. 219).

Plaintiff stated at first that she only took the pain medication prescribed by her physicians when she experienced pain, reporting that she did not like "being doped up all the time" (Tr. 219). However, when the ALJ asked Plaintiff why she had been prescribed both Darvocet and Tylenol III along with Litoderm patches, she admitted that she took Darvocet on a regular basis, because it was not "as strong as Tylenol III" and that she required a medication that would "let her walk around" while on her recent cruise (Tr. 221-222). She reported that she used a Litoderm patch every day, used Tylenol III two to three times a week and Darvocet twice a week, indicating that she took extra strength Tylenol otherwise (Tr. 223). She testified that her prescribed medication made her "extremely tired"(Tr. 223).

Plaintiff reported that she usually needed help with grocery shopping, but performed all of her own laundry chores (Tr. 224). She stated that her son performed the yard work and that housework other than laundry was performed by another individual (Tr. 224). She stated

-3-

that she slept poorly, due to right knee pain, and napped two to three times a day for approximately half an hour at a time, depending upon how well she had slept on the previous night (Tr. 225). She testified that she developed leg cramps after a few minutes in a sitting position, adding that she could otherwise sit for about an hour and a half if she made postural adjustments (Tr. 226). Due to right knee and back problems, she estimated that she could not stand for more than two to four minutes (Tr. 226). She indicated that walking was somewhat easier than standing, stating that she thought she could walk an entire block (Tr. 227). She reported that she could not perform any meaningful lifting with her right hand, but could lift a gallon of milk with her left hand (Tr. 227). She testified she could climb stairs with difficulty, but found descending even a flight of stairs almost impossible (Tr. 228). She stated that she could bend, but experienced difficulty returning to a standing position (Tr. 228). She reported avoiding any pushing and pulling because of lower back strain and performed "[v]ery minimal" overhead reaching (Tr. 228). She professed difficulty writing or holding a fork (Tr. 229). In addition to muscular-skeletal problems, she stated that she experienced frequent urges to urinate since undergoing a hysterectomy (Tr. 232). She indicated that her condition obliged her to urinate every two to three hours (Tr. 236).

Plaintiff testified that beginning in 1997, she was assigned a "stock chaser's job," opining that her job was not "a true stock chaser's job," but rather, the result of an agreement between the union and management to allow her to continue working (Tr. 233). She stated that she remained in the stock chasing position for two months, but reported difficulty lifting boxes, adding that she did not think she could resume that position because of the walking

-4-

requirements (Tr. 233-234).  She testified that her next plant job, a line auditor position, required her to audit various departments to ensure that they were adhering to company procedures (Tr. Tr. 235).   She indicated that the amount of time she spent sitting and standing varied from day to day (Tr. 238).

### B.    Medical Evidence

In March, 2001, Gavin I. Awerbuch, Plaintiff's treating neurologist, noting that Plaintiff exhibited reduced grip strength bilaterally, advised her to consult with a hand surgeon, advising her further to begin a course of occupational therapy (Tr. 166).  He recorded that Plaintiff's gait was normal and that she was able to heel walk, toe walk, and "perform tandem" (Tr. 166).

Shortly before Plaintiff ceased work, Thomas H. Beird, M.D., recorded that Plaintiff experienced the symptoms of CTS (Tr. 178).  Plaintiff reported minimal relief from wearing splints and taking Vioxx (Tr. 177).  Dr. Beird, noting that Plaintiff had undergone previous bilateral releases in addition to the one then contemplated, stated "[a]s this is a second operation, I do not believe she will [be] able to return to hand intensive type activity.  I have advised her to change her work status and postpone surgery until new employment can be found or discontinue her current employment pending operative decompression over concern of significant recurrence" (Tr. 177).  Dr. Beird opined that "it would be unwise for her to return to [repetitive hand related activities] in the future" (Tr. 178).

Also in May, 2001, Dr. Awerbuch reported that Plaintiff complained of lower back pain along with leg numbness and cramping (Tr. 162).  EMG and nerve conduction studies

performed subsequently showed normal results (Tr. 160).  An MRI of the lumbar spine indicated "minimal foraminal narrowing bilaterally" at the L4-L5 and L5-S1 levels and "degeneration of the L4-L5 intervertebral disc" (Tr. 133).   An MRI test of Plaintiff's left knee showed normal results (Tr. 132).

In January, 2002, Plaintiff underwent CTS release on the left without complications (Tr. 112). In March, 2002, EMG results showed bilateral carpal tunnel syndrome, with improvement of ten to fifteen percent as a result of surgery (Tr. 152). In April, 2002, after complaining of wrist swelling and tenderness, along with tennis elbow, Plaintiff underwent synovectomy of the right wrist (Tr. 116-117).

In April, 2002, Robin Mika, D.O., performed a Physical Residual Functional Capacity Assessment of Plaintiff (Tr. 120-127).  She found that Plaintiff was capable of performing light work, including the ability to stand or walk for six hours in an eight hour workday (Tr. 121).  In addition, she found that Plaintiff retained an unlimited ability to push and pull in the lower extremities, and the ability for occasional pushing and pulling in the upper extremities (Tr. 121).  She further limited Plaintiff to only occasional climbing, stooping, kneeling, crouching, and crawling, and prohibited all balancing (Tr. 122).  She found that Plaintiff should avoid all exposure to vibration and machinery and heights (Tr. 124).  Dr. Mika noted that she found Plaintiff fully credible (Tr. 125).

In June 2002, Plaintiff sought treatment for pain management (Tr. 129). John N. DiBella, M.D., examined Plaintiff, concluding that her condition did "not clearly define a true lumbar radiculopathy" (Tr. 130). EMG studies of lower extremities conducted the same

month showed normal results (Tr. 147).  At a followup examination in September, 2002, Plaintiff continued to complain of lower back pain and demonstrated reduced lumbar motion (Tr. 145). An MRI conducted the same month showed mild degenerative changes, but otherwise normal results (Tr. 131).  In December, 2002, Plaintiff  reported limited abilities to stand, walk, bend and kneel (Tr. 144).  Dr. Awerbuch renewed her prescriptions for Effexor, Lidoderm, Ultram, and Skelaxin, recommending she begin physical therapy for her hip (Tr. 144).

In October, 2003, Neil A. Friedman, M.D., examined Plaintiff on behalf of the Social Security Administration (SSA) (Tr. 181-187).  Plaintiff indicated that she took Vioxx, and Tylenol #3, along with using Lidoderm patches (Tr. 182).  Dr. Friedman found that "Plaintiff's cervical range was full and . . . pain free in all planes," and that she could hold a pen with her dominant hand and write legibly (Tr. 183).  He reported that Plaintiff walked with a slight limp, but without the use of an assistive device (Tr. 183).  She demonstrated an ability to squat and arise from a deep knee bend without complaint or discomfort (Tr. 183).

Dr. Friedman also evaluated Plaintiff's future ability to perform work-related functions (Tr. 188-191).  He found that Plaintiff's conditions did not limit her ability to lift, stand, walk or sit, but restricted her to only occasional climbing, balancing, kneeling, crouching, crawling, stooping, handling, fingering, and feeling (Tr. 188-190). He found further that Plaintiff's exposure to vibration should be limited due to her surgeries for CTS (Tr. 191).

### C.      Vocational Expert Testimony

VE Pauline McEachin, stating that her testimony comported with information contained in the Dictionary of Occupational Titles (DOT), indicated that her findings represented the geographical scope of the lower peninsula of Michigan (Tr. 239-240). ALJ Jones posed the following question to the VE:

> "I ask you to assume a hypothetical individual that was 52 years and has a high school diploma and has the work experience that you've identified in Exhibit 13E [Tr. 106], who is able to perform light work that involved only occasional pushing or pulling and occasional bending at the waist, no bending at the knees, and no kneeling, and no climbing stairs, no crawling, no climbing ladders, no exposure to unprotected heights or hazardous moving machinery, uncovered moving machinery, occasional forward reaching, occasional overhead reaching, . . .occasional gross manipulation, occasional fine manipulation with the right hand only. I mean, do it with the – frequency [sic] of the left. Occasional use of the hands for feeling but again, occasional on the right and just frequent but not constant on the left, and no use of vibrating tools, and no forceful or sustained gripping or grasping, no constant repetitive wrist movements, and only occasional exposure to very cold temperatures. Now would such a person be able to perform any of [Plaintiff's] past jobs either as she actually performed them or as they generally exist in the national economy?"

(Tr. 243).

The VE replied that based on Plaintiff's descriptions of her previous jobs, she could perform both the stock chaser and line auditor positions which she classified as unskilled at the light exertional level (Tr. 243).[1] She indicated that other unskilled, light work available to the an individual with the limitations set forth in the above hypothetical would include

---

[1]Upon questioning by Plaintiff's attorney, the VE later stated that Plaintiff could not perform the line auditor position since it entailed climbing stairs - one of the activities proscribed in the hypothetical (Tr. 246 *referencing* Tr. 82).

-8-

work as a visual inspector (2,200 jobs), information clerk (1,700 jobs), inspector (reduced range) (3,000 jobs), and security guard (4,000) (Tr. 244).

The VE stated that if the same individual were limited to sedentary work, based on Plaintiff's description of her jobs, she could not perform her past work as a stock chaser or line auditor (Tr. 244). She added that certain stock chasing and line auditing position could be limited to sedentary work, but she indicated that she could not provide "specific numbers," since the job descriptions of both positions varied from one employer to the next (Tr. 244).

She testified that within the hypothetical limitations set forth by the ALJ, Plaintiff could perform a number of sedentary unskilled jobs within that hypothetical including the positions of general office clerk (5,000 jobs) receptionist (4,000 jobs) and video surveillance monitor (2,000 jobs) (Tr. 245).

### D.  The ALJ's Decision

Citing Plaintiff's medical records, ALJ Jones found that Plaintiff's impairments of bilateral CTS status post release surgery; tendonitis of the right wrist status post excision of ganglion cyst, right wrist and synovectomy; status post repair of the severed extension tendon of the right middle finger; excision of ganglion cyst from repaired tendon; degenerative disc disease of the lumbar spine; history of right epicondylitis; status post excision of right calcaneal spur; right trochanteric bursitis; exogenous obesity; status post total hysterectomy; hypertension; post esophalgeal reflux disease; bilateral knee pain; and status post bilateral breast reduction surgery were "collectively 'severe' within the meaning of the Regulations,

but are not sufficiently severe to meet or medically equal the criteria of any impairment, or combination of impairments, contained in the Medical Listings" (Tr. 24).

He found that Plaintiff retained the RFC involving:

> "occasional (up to 33% of the time) pushing or pulling, occasional bending at the waist; occasional bending at the knees; occasional kneeling; occasional forward and overhead reaching; occasional exposure to very cold temperatures, frequent, but not constant (up to 66% of the time) gross and fine manipulation, frequent, but not constant use of the hands for feeling, no crawling, no forceful or sustained gripping and grasping, no constant repetitive wrist movements and no use of vibrating tools"

(Tr. 25).

The ALJ determined that Plaintiff's "activities precluded by [her] residual functional capacity" did not prevent her from performing her past jobs as a stock chaser and line auditor (Tr. 27). In support of his finding that Plaintiff's allegations of physical limitations were "not totally credible," he noted that Plaintiff did not seek "significant medical treatment" during 2003 and that her claimed limitations were not substantiated by objective clinical findings (Tr. 25, 28). The ALJ noted that in spite of her allegations of disability, Plaintiff continued to drive daily, shop, cook, and travel to Florida (Tr. 22).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S.

-10-

389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen*,  800 F.2d 535, 545 (6th Cir. 1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at

step five  to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### A.    Past Relevant Work

Plaintiff faults the ALJ for his Step Four finding that Plaintiff could return to her former jobs of stock chaser and line auditor.  *Plaintiff's* Brief at 7.  Citing *Hargender v. Califano,* 575 F. 2d 434 (3rd Cir. 1978), she maintains that the ALJ did not make "full and explicit findings" sufficient for the Court to evaluate his decision. *Plaintiff's* Brief at 7   She claims further that the ALJ improperly delegated his analysis to the VE at Step Four.  *Id.*

At Step Four, the Commissioner considers whether the claimant has the RFC to perform the functional demands and duties of a past job as actually performed by the claimant. SSR 82-61.  If so, the claimant is not disabled.  If not, the Commission considers whether the claimant can perform the functional demands and job duties of the occupation as generally required by employers throughout the national economy. *Id.*  Thus, if a claimant has the RFC to work at his or her past job as actually performed, even if that particular job is less demanding than the work as generally performed, or even if it involves fewer hours or greater opportunity for rest, he or she will be found not disabled at step four.  *Stephens v. Shalala,* 50 F.3d 538, 542 (8th Cir. 1995).

Under SSR 82-62, a three-prong test must be met in order to find that a claimant can return to his past relevant work "(1) a finding of fact as to the individual's RFC; (2) a finding

of fact as to the physical and mental demands of the past job; and (3) a finding of fact that the individual's RFC permits a return to that past job."

Contrary to Plaintiff's assertion, ALJ Jones' opinion contained full and explicit findings which supported his Step Four determination. Although Plaintiff faults the ALJ for failing to adopt Dr. Beird's May, 2001 "opinion" that Plaintiff could not return to her former job, the administrative decision, which places the physician's statement within the context of additional findings, not only acknowledges, but concurs with its limitations on Plaintiff's activity (Tr. 26). Dr. Beird stated that her CTS was "strongly correlated with her repetitive hand related activities at Delphi Automotives. . . . indicat[ing] that it would be unwise for her to return to this type of work related activity in the future" (Tr. 178).

First, the ALJ noted that the RFC reflected Dr. Beird's May, 2001 opinion that she should avoid "repetitive hand movements" (Tr. 26). The ALJ indicated that he tempered the physician's statement to an extent because Plaintiff had subsequently undergone Carpal Tunnel release surgery which appeared to improve her condition (Tr. 26 *citing* Tr. 152). Second, he pointed out that his findings were essentially consistent with the physical RFC assessment performed by Dr. Mika in April, 2002 (Tr. 26. *citing* Tr. 120-127).[2]  Third,

_____

[2]Dr. Mika's finding that Plaintiff could perform handling, fingering and feeling activities *frequently*, adopted by the ALJ, stands at odds with Dr. Friedman's October, 2003 opinion that Plaintiff could perform these activities only *occasionally* (Tr. 190). However, additional substantial evidence, including post-operative statements by Plaintiff's treating physician and the ALJ's well-articulated credibility determination support his finding. The VE's finding that Plaintiff could perform her past work even if she could perform feeling activities and fine manipulations with her dominant hand only *occasionally*, indicate that even if she experienced a greater degree of limitation in handling, fingering, and feeling

-13-

although Plaintiff alleged disability based on CTS and a variety of back and lower extremity conditions, the ALJ justifiably discounted a portion of her complaints, noting that a June, 2002 EMG of her lower extremities showed normal results, as well as an MRI of her lumbar spine performed in September, 2002 which showed only "mild degenerative disc disease." (Tr. 25). He also found that Plaintiff's daily activities belied her claimed limitations, citing her continued ability to shop, drive, visit relatives and friends, as well as multiple trips to Florida (Tr. 25).

Plaintiff's argument that the ALJ impermissibly delegated his fact-finding responsibility to the VE is also unpersuasive. First, the ALJ may support a step four finding with a VE's testimony. *See Walker v. Secretary of Health and Human Services,* 884 F. 2d 241, 245 (6th Cir. 1989). The ALJ's reliance on the VE's testimony for evidentiary support is not the same as delegating the decision. Moreover, Plaintiff's related argument that suggests that the ALJ was prohibited from using the VE's testimony in making a Step Four determination is also without merit. Although the Plaintiff correctly notes that the ALJ is not required to consult a VE in making a Step Four determination *(See Dodds v. Commissioner of Social Security,* WL 2002 1880754, 3 (E.D. Mich. 2002)), it does not follow that he is *forbidden* to use a VE. *See Studaway v. Secretary of Health and Human Services,* 815 F.2d 1074, 1076 (6th Cir.1987) (affirming the ALJ's decision to use a VE's testimony in making a Step Four determination: "The administrative law judge relied on a vocational expert's

---

activities than those indicated in the RFC, the ALJ was nonetheless entitled to find her non-disabled at Step Four.

-14-

testimony in finding that [Plaintiff could perform past work].)"  Further, "[a]t step four of the sequential evaluation process, the decision to use a vocational expert is at the discretion of the ALJ.  The Commissioner has noted that such experts are used to resolve complex vocational issues." *Mays v. Barnhart,* 78 Fed. Appx. 808, 813-814  (3rd Cir. 2003)(internal citations omitted).

Second, although the ALJ cited the VE's testimony as one factor in support of his Step Four findings,  he considered other factors in addition to the VE's testimony.  As noted above, along with the VE's testimony, the ALJ relied on the Plaintiff's activities and medical records. The ALJ's findings, supported by substantial evidence, reflect adherence to the dictates of SSR 82-62 which require that he make a fact finding of Plaintiff's RFC, the physical and mental demands of the past job, and a finding of fact that Plaintiff can return to her past work (Tr. 22).

Plaintiff's argument that her stock chaser position was a position created as a result of an agreement between her union and employer and did not entail the full responsibilities of a true stock chaser's position also fails.  *Plaintiff's Brief* at 11.  *See Stephens, supra,* 50 F.3d at 542 (as long as a plaintiff's RFC allows her to perform *her* former work duties - regardless of whether such work is as strenuous as other positions with the same job title - the ALJ must determine that she is not disabled).

### B.    Medical Evidence Submitted to the Appeals Council

In arguing for remand, also Plaintiff's cites a June, 2003 EMG study which shows "[r]ight S1 radiculopathy" *Plaintiff's Brief* at 11 citing Tr. 193. Plaintiff argues that although

this material was submitted to the Appeals Council subsequent to the administrative decision, Plaintiff argues that the additional evidence is relevant to the period of disability and should be considered by this Court. *Id.*

Sentence Six of 42 U.S.C.A. § 405(g) states that the court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . ." In *Melkonyan v. Sullivan,* 501 U.S. 89, 97-98, 111 S.Ct. 2157, 2163, 115 L.Ed.2d 78 (1991) the Court held that a Sentence Six remand (in which the district court retains jurisdiction) "does not attach to any substantive ruling but merely remands the matter for further review in light of newly discovered evidence which is to be considered by the administrative law judge and therefore does not constitute a 'judgment' from which appeal can be taken."  Therefore, the reviewing court may consider the additional evidence only for purposes of determining whether remand is appropriate under the sixth sentence of 42 U.S.C. §405(g).  In *Cotton v. Sullivan,* 2 F.3d 692, 696 (6th Cir. 1993) the court held that where the Appeals Council denies a claimant's a request for a review of his application based on new material, the district court cannot consider that new evidence in deciding whether to "uphold, modify, or reverse the ALJ's decision." *Cotton* 2 F.3d at 695-96.

Likewise, the Appeals Council in the present action declined to review the material (Tr. 192-205) submitted over three after the administrative decision had been issued (Tr. 8). Therefore, consideration of the above records must be limited to whether it justifies a

Sentence Six remand.  Pursuant to 42 U.S.C.A. § 405(g), Plaintiff has not shown good cause for her failure to include this evidence into the record before issuance of the administrative decision.  Although at a minimum, the new material predates the February 20, 2004 hearing by over two months, Plaintiff has not offered any explanation for its late submission.   In addition, Plaintiff has failed to establish the materiality of the additional records.  In order for the claimant to satisfy his burden of proof as to materiality, she must demonstrate that there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence.  *Sizemore v. Secretary of Health and Human Services,* 865 F.2d 709, 711 (6th Cir.1988).

Although Plaintiff argues that a June, 2003 EMG report showing radiculopathy demonstrates that the ALJ should have incorporated a sit/stand option into her RFC or limited her to sedentary work, as discussed by Defendant, "even if Plaintiff were allowed to rely on that report, she has presented virtually no argument or authority . . . establishing that a disc herniation automatically results in a sedentary RFC or the need for a sit/stand option." *Defendant's Brief* at 16.[3]   Further, substantial evidence found elsewhere in the record

---

[3]Although not cited by Plaintiff, the new material also includes a December 18, 2003 opinion by Dr. Awerbuch that Plaintiff cannot perform "any type of gainful employment on a regular and sustained basis" (Tr. 200).  However, as discussed in detail by the ALJ in regard to previously submitted material, "Dr. Awerbuch's reports received reduced weight because they are uniformly lacking in reasonable detail and consistency, and are prepared more to support claims of work related injury than to document ongoing medical treatment" (Tr. 25).  The Court notes that up until the June, 2003 EMG, Dr. Awerbuch's reports of back and lower extremity pain stand unsupported by objective medical tests, which failed to confirm Plaintiff's complaints.

-17-

disputes such a conclusion.  For example, subsequent to the June test, Dr. Friedman found no limitations on Plaintiff's ability lift, stand, walk, or sit (Tr. 188-189). In addition to Plaintiff's failure to establish cause for a Sentence Six remand, I agree with the ALJ that her allegations of disability were belied by her relatively active lifestyle.  Plaintiff traveled to Florida twice and went on a cruise with her husband during the same time period that she claimed that she could not stand for more than four minutes at a time (Tr. 213-214, 226). Plaintiff's daily activities form  indicates that she visited friends at a nearby campground, played cards, hosted her grandson's three-hour birthday party, traveled "up north" with her daughter, and dined out with family (Tr. 88-90).  Plaintiff's activities are not cited to trivialize her legitimate discomfort, but to further demonstrate that the ALJ's decision is properly within the "zone of choice" accorded to the fact-finder at the administrative hearing level, and pursuant to *Mullen v. Bowen*, *supra*,  should not be disturbed by this Court.

## CONCLUSION

For the reasons stated above, I recommend  that Defendant's Motion for Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED.

Any objections to this  Report and Recommendation must be filed  within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir.  1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.  1981).  Filing of objections which raise some issues but fail to raise others with

-18-

specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


s/R. Steven Whalen                              
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated:  August 24, 2005

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on August 24, 2005.


s/Gina Wilson                                   
Judicial Assistant

-19-